**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| LONGITUDE LICENSING LIMITED and 138 EAST LCD ADVANCEMENTS LIMITED | § | |
| Plaintiffs, | § | |
| v. | § | NO. 2:23-CV-00515-JRG-RSP |
| BOE TECHNOLOGY GROUP CO., LTD., | § | |
| Defendant. | § | |

**CLAIM CONSTRUCTION ORDER**

Before the Court is Plaintiffs' Opening Claim Construction Brief (Dkt. No. 100) filed by Longitude Licensing Limited and 138 East LCD Advancements Limited (collectively, "Plaintiffs" or "Longitude"). Also before the Court is the Defendant's Responsive Claim Construction Brief (Dkt. No. 106) filed by BOE Technology Group Co., Ltd. ("Defendant" or "BOE"), along with Plaintiffs' Reply Claim Construction Brief (Dkt. No. 109).

The Court held a hearing on January 17, 2025. Having considered the parties' briefing along with arguments of counsel, the Court resolves the disputes as ordered herein.

# I. BACKGROUND

Plaintiffs allege infringement of six patents in the field of liquid crystal display (LCD) technology. Four of the six asserted patents contain terms that require claim construction and are addressed herein. The four patents for claim construction are: U.S. Patent No. 7,502,079 ("the '079

Patent"), U.S. Patent No. 7,705,948 ("the '948 Patent"); U.S. Patent No. 8,223,093 ("the '093 Patent"), and U.S. Patent No. 9,557,606 ("the '606 Patent") (collectively, the "Patents in Suit").

The title of the '079 Patent is "Electro-optical device and electronic apparatus" and the Abstract states:

> An electro-optical device of the present invention includes pixel electrodes, TFTs electrically connected to the pixel electrodes, and scanning lines and data lines connected to the TFTs on a TFT array substrate. Each scanning line has a broad width portion as a gate electrode in a portion facing a channel area of the TFT and the narrow width portion. As a result, an electro-optical device capable of easily adjusting an arrangement of the gate electrodes and the scanning lines and at the same time precisely driving the TFTs is provided.

The title of the '948 Patent is "Liquid crystal display device" and the Abstract states:

> A liquid crystal display device having an upper electrode layer and a lower electrode layer formed on an identical substrate via an insulating layer includes slits formed on the upper electrode layer for applying voltage between the upper electrode layer and the lower electrode layer and driving liquid crystal molecules. Edge portions of the slits each include a first curved portion the tangential direction of which at the edge portions with respect to the rubbing direction falls within a range from 0° to +90° and a second curved portion the tangential direction of which at the edge portions with respect to the rubbing direction falls within the range from 0° to −90°. The direction toward an acute angle subtended by the long sides of the slits with respect to the rubbing direction is the positive direction. The second curved portion is smaller than the first curved portion.

The title of the '093 Patent is "Electro-optical device, electronic apparatus, and projection display" and the Abstract states:

> An electro-optical device includes an element substrate having a first signal line; a second signal line extending in a second direction crossing the first signal line; a first field-effect transistor including a first semiconductor layer extending in a direction crossing the second direction; a second field-effect transistor including a second semiconductor layer extending in the direction crossing the second direction; a first pixel electrode is adjacent to a second pixel electrode. The first semiconductor layer and the second semiconductor layer are displaced from each other in the second direction. An end of the first semiconductor layer facing toward the second pixel electrode is closer to the second pixel electrode than an end of the second semiconductor layer facing toward the first pixel electrode.

The title of the ’606 Patent is “Liquid crystal display device having rectangular close-shape seal members” and the Abstract states:

> A method of manufacturing a liquid crystal device having a first substrate and a second substrate facing each other with a liquid crystal layer interposed therebetween, and a sealing member formed in a peripheral portion of at least one of the substrates. The method includes forming the sealing member, disposing the liquid crystal layer inside the sealing member, and bonding the first substrate to the second substrate. In forming the sealing member, a ring-shaped portion that seals the liquid crystal layer inside the sealing member, a first sealing layer and a second sealing layer that face each other to be separated from each other are formed. In the bonding of the first substrate to the second substrate, a junction portion is formed in which the first and second sealing layers are pressed and joined outside the sealing member so as to form the ring-shaped portion.

## II. LEGAL STANDARDS

“‘[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.’” *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). “[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim.” *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*); *aff’g,* 517 U.S. 370, 390 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent’s claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* “One purpose for examining the specification is to determine if the patentee has limited the scope of the claims.”

*Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.,* 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips,* 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Phillips*, 415 F.3d at

1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

Intrinsic evidence, therefore, is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.,* 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips,* 415 F.3d at 1312). But for claim terms with less-apparent meanings, courts consider " 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' " *Phillips,* 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). In those situations, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

However, the intrinsic record may not be sacrificed in favor of extrinsic evidence. According to *Phillips*, reliance on dictionary definitions, for example, at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910, 134 S. Ct. 2120, 2129 (2014). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id*. The claims "must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

The parties have reached agreement on the following term and construction as submitted in their Joint Claim Construction Chart Pursuant to P.R. 4-5(d). (Dkt. 112).

| Term | Agreed Construction |
|---|---|
| "the insulating layer comprising slits formed on the upper electrode layer for applying voltage between the upper electrode layer and the lower electrode layer and for driving liquid crystal molecules"<br><br>('948 patent, claim 1) | Plain and ordinary meaning |

## IV. DISPUTED TERMS

### U.S. Patent No. 7,502,079

### 1. "extends in a direction," "extending in the direction," "extending in the predetermined direction," and "extending along"

| Claim Term | Plaintiffs' Construction | Defendant's Construction |
|---|---|---|
| "extends in a direction," "extending in the direction," "extending in the predetermined direction," and "extending along"<br><br>('079 Patent, claim 2) | No construction necessary<br><br>If necessary for clarity to the factfinder with respect to certain terms, "a channel area that extends in a direction" refers to the channel's "main current path" | "elongated in a/the direction,"<br><br>otherwise indefinite |

The disputed issue as to this term is whether "extends" or "extending" needs construction; and, if so, whether it means "elongated" or is indefinite. Both parties appear to agree that "extend" expresses a geometric relationship between the recited elements in claim 2 but disagree on what exactly that geometric relationship is.

Longitude argues that the "extend" limitations plainly describe which claim elements are oriented in a similar direction and which intersect such that no construction is necessary. Longitude asserts that BOE's proposal of "elongated" is wrong because it requires "extend" to apply in only one direction and because it excludes the specification's disclosure of an element that has no elongation yet extends in a direction. Longitude further contends that the '079 Patent does not limit a transistor's "channel area" to an "elongated" shape because it does not address the transistor or channel shape at all; instead, it addresses "a suitable arrangement of the channel area (or TFT) and the scanning line gate electrode)." ('079 Patent, 1:66-2:2.) As an alternative proposal, Longitude submits a construction provided by its expert, Dr. Schubert, that explains that the known meaning of a transistor "channel" direction in the art would typically refer to the direction from the

transistor's source to its drain. Thus, Longitude argues in the alternative that "a channel area that extends in a direction" refers to the channel's "main current path" between the source and drain electrodes in a field-effect transistor.

BOE disagrees that Longitude's alternative proposal should be adopted because no claim element recites a "main current path" and because this construction would not make sense as applied to all the "extends" limitations. Rather, BOE contends that FIGS. 1 and 2 in the specification support its position that "extending" in a direction means that the recited elements are "elongated" in that direction. If the term is not construed, BOE believes it would be indefinite because at least the "channel area" could extend in any arbitrary direction that would then create many different configurations of data line, scanning line, and capacitive line that depend on the direction of the channel area.

For the Court to begin analysis of this term, it is instructive to review the language of claim 2 of the '079 Patent, which reads as follows with the disputed terms in bold:

> 2. An electro-optical device, comprising:
>
> a thin-film transistor having a channel area that **extends in a direction** and that intersects a predetermined direction that intersects the direction;
>
> a pixel electrode formed correspondingly to the thin-film transistor;
>
> a data line **extending in the direction** in which the channel area extends, the data line having a broad portion that overlaps the thin-film transistor and a non-broad portion that does not overlap the thin-film transistor, the broad portion being wider than the non-broad portion;
>
> a scanning line **extending in the predetermined direction** and intersecting the data line and the channel area of the thin-film transistor, the scanning line having a broad-width portion in a portion facing the channel area of the thin-film transistor and a narrow width portion in another portion;
>
> a storage capacitor including a pixel-potential capacitor electrode, a fixed-potential capacitor electrode, and a dielectric film interposed between the pixel-potential capacitor electrode and the fixed potential capacitor electrode; and
>
> a capacitive line having a portion that serves as the fixed-potential capacitor electrode of the storage capacitor, the capacitive line having a portion **extending along** the scanning line and a portion **extending along** the data line, the portion **extending along** the data line having a width that is narrower than the broad portion of the data line and that is wider than the non-broad portion of the data line.

A plain reading of this claim shows that it is written to describe a relative geometric relationship between the various claim elements. In particular, the channel area of the thin-film transistor (TFT) "extends in a direction" and also "intersects a predetermined direction." The data line extends in the same "direction in which the channel area extends." The scanning line extends "in the predetermined direction and intersect[s] the data line and the channel area" of the TFT. Thus, the channel area of the TFT and the data line run parallel to each other and intersect the scanning line in what appears to be an intersection of two axes along a grid-like pattern. The capacitive line runs both ways as it has a portion that extends "along the scanning line" and a portion that extends "along the data line."

The concept of intersecting axes along a grid-like pattern is elaborated upon in the patent specification. The written description discloses "pixel electrodes arranged in a matrix shape, thin-film transistors (hereinafter "TFT") connected to the respective pixel electrodes, and scanning lines and data lines connected to each of TFTs and provided in parallel to a row direction and a column direction . . . ." ('079 Patent, 1:29-33.) FIGS. 1, 2, 4, 5, 6, 8, 10, 13, 14, 16 all show a matrix-style arrangement with defined X-Y axis. In particular, FIG. 1 is described as "a schematic circuit diagram illustrating an equivalent circuit of various elements, wirings and the like provided in a plurality of pixels, having a matrix shape, constituting an image display area in an electro-optical device according to an exemplary embodiment of the present invention" identifying "data lines 6a," "scanning lines 330a," and "capacitive line 300)" arranged in an intersecting grid-like pattern. (*See id.*, 12:27; 12:33; 14:51; *see also*, 2:26-28.) As a result, the "extend" limitations at least with respect to the various "line" elements in this arrangement are easily understandable to a person of ordinary skill reading the claims in context of the patent specification.

Indeed, the parties are largely aligned on the meaning of "extend" as applied to the "line" limitations. Longitude agreed with BOE during the hearing that a line extends along the direction of its length and is much longer than it is wide. Thus, the linear nature and relative geometry of "a data line extending in the direction," "a scanning line extending in the predetermined direction," and "the capacitive line having a portion extending along" are clear.

The crux of the dispute is over the limitation of "a thin-film transistor having a channel area that extends in a direction," which Longitude asserted during oral argument is positioned differently from the "line" terms. Longitude contends that unlike the linear nature of wires, the transistor channel area has different and specific characteristics that have nothing to do with the physical measurements of the channel area. Specifically, Longitude submits that the length of a transistor channel is the distance between its source and drain, not a relatively longer distance in one direction (length) in comparison to another (width).

BOE disagrees that the channel length in a transistor should be treated any differently than the data line, scanning line, or capacitive lines. BOE contends that the claimed invention is purely geometric; therefore, the "extend" term should apply equally to channel area as to the other terms. Moreover, BOE clarified that its understanding of "elongated" means the length of the shape must be longer than it is wide, thereby excluding shapes like a square that has equal dimension on all sides.

Upon review of the parties' submissions and listening to oral argument, the Court concludes that the "channel area" must be read in context of its position within a transistor. The claim language reads in full, "a thin-film transistor having a channel area," so "channel area" cannot be considered a purely geometric shape without any consideration of the transistor of which it is an integral part. As Dr. Schubert explained, a person of ordinary skill would view this term in

the context of the semiconductor channel area that refers to the direction of current flow through the channel between the source and drain electrodes. (Dkt. 100-5, ¶ 37.) The Court is persuaded by Dr. Schubert's explanation of the channel area's position within the transistor between the source and drain electrodes. However, there exists a concern about the accuracy of identifying the direction of extension as the main direction of current flow or the current path because the direction of current flow may not always be linear or clear.

The Court therefore construes this term as "a channel length that runs between source and drain electrodes." The phrase "channel length" provides more clarity than "channel area" because the parties both referred to it as such and the specification also identifies the channel area as being a channel length ('079 Patent, 3:52-59) as well as having a defined direction (describing the channel area as extending in a Y direction, *id.*, 14:25-30). The direction of the channel length is along the axis running between the source and drain electrode of the TFT, which is also generally the direction of current flow.

The Court is not persuaded by BOE's proposed construction and therefore rejects it. The word "elongated" is in neither the claims nor specification. It is unclear what kind of shape is "elongated" or how a line or area can be "elongated" in a way that is more accurate or meaningful than the words in the claim as written. Such a construction would be more confusing than helpful to the jury. Moreover, the Court finds there to be a difference to how "extends" applies to the various "line" limitations as compared to "a thin-film transistor having a channel area that extends in a direction."

The Court therefore finds that the claim terms "extends in a direction," "extending in the direction," "extending in the predetermined direction," and "extending along" **are not indefinite.** The Court further finds that "a data line extending in the direction," "a scanning line extending in

the predetermined direction," and "the capacitive line having a portion extending along" **should be given their plain and ordinary meaning,** and that "a channel area that extends in a direction" **means "a channel length that runs between source and drain electrodes."**

**U.S. Patent No. 7,705,948**

**2. "rubbing direction"**

| Claim term | Plaintiffs' Construction | Defendant's Construction |
|---|---|---|
| "rubbing direction"<br><br>('948 Patent, claim 1) | Plain and ordinary meaning, which is "the alignment direction of the long axis of the liquid crystal molecules in the absence of an applied electric field" | "direction of the rubbing process" |

The issue to be resolved here is whether the "rubbing direction" is used generically in the claim to identify a starting alignment direction of the liquid crystal molecules or whether it is a direction that only exists in reference to a rubbing process.

Longitude argues, through their expert Dr. Schubert, that "rubbing direction" has a plain and ordinary meaning in the art, which is "the alignment direction of the long axis of the liquid crystal molecules in the absence of an applied electric field." (Dkt. 100-5, ¶ 43.) Longitude cites to parts in the '948 Patent specification describing "rubbing direction" as the default alignment direction of liquid crystal molecules, independent of any specific process used to set the alignment direction. Longitude particularly relies upon an open-ended statement in the specification explaining that "the initial alignment of the liquid crystal molecules is oriented substantially

parallel to the long sides of the openings through a rubbing process ***or the like***.” (’948 Patent, 1:57-60 (emphasis added)).

BOE disagrees, asserting that the plain and ordinary meaning of “rubbing direction” is the “direction of the rubbing process,” adding that if an initial alignment process does not involve rubbing, the term “rubbing direction” would not be used. While BOE agrees that the Applicant of the ’948 Patent was aware that alignment processes other than rubbing were available at the time, the “rubbing direction” was specifically claimed instead of the broader term “initial alignment direction.”

The Court begins its analysis of this term by reviewing the language of claim 1 of the ’948 Patent, which reads as follows, with the disputed term in bold:

> 1. A liquid crystal display device comprising:
> a substrate;
> an upper electrode layer formed on the substrate, the upper electrode layer having slits;
> an insulating layer formed between the substrate and the upper electrode layer; and
> a lower electrode layer formed between the substrate and the insulating layer;
> the slits allowing for application of a voltage between the upper electrode layer and the lower electrode layer, the voltage driving liquid crystal molecules,
> an upper electrode layer and a lower electrode layer formed on a same substrate via an insulating layer,
> the insulating layer comprising slits formed on the upper electrode layer for applying voltage between the upper electrode layer and the lower electrode layer and for driving liquid crystal molecules,
> edge portions of the slits each including a first curved portion the tangential direction of which at the edge portions with respect to a **rubbing direction** falls within a range from 0° to +90° and a second curved portion the tangential direction of which at the edge portions with respect to the rubbing direction falls within the range from 0° to −90°, where the direction toward an acute angle subtended by the long sides of the slits with respect to the **rubbing direction** is the positive direction, the second curved portion being smaller than the first curved portion, wherein the second curved portion includes a projecting portion, the projecting portion being located at a distal end of the second curved portion.

The plain language of the claim is written as "rubbing direction," rather than "initial direction," "alignment direction," or even just "direction." This suggests the term "rubbing direction" was selected intentionally rather than used as a reference for a generic starting direction. The word "rubbing" must therefore be given meaning apart from the word "direction." *See LodSys, LLC v. Brother Int'l Corp*., No. 2:11-cv-90-JRG, Dkt. No. 689 at 89 (E.D. Tex. Jun. 14, 2013) ("In all events, a patentee cannot, through a proposed claim construction, seek to 'read out' express claim limitations.").

The specification does not describe the rubbing process in much detail but it does consistently associate a "rubbing direction" as being derived from a rubbing process. Specifically, the patent explains that "the initial alignment of the liquid crystal molecules is oriented substantially parallel to the long sides of the openings through a rubbing process or the like…" ('948 Patent, 1:57-60.) In the described embodiments, the "alignment layer is arranged on the common electrodes 60, which is rubbed as an alignment process." (*Id.*, 7:17-18.) In one example, an "array substrate (see FIG. 5) is completed by forming the alignment film on the common electrodes 60 and performing the rubbing process." (*Id.*, 7:25-27.) And in another example, the "alignment layer is a film having a function to cause the liquid crystal molecules to assume the initial alignment, is formed of an organic film such as polyimide, and is rubbed when in use." (*Id.*, 8:67-9:3.) With respect to the clause Longitude relies upon ("through a rubbing process ***or the like***"), the Court does not read that statement as making "rubbing direction" generic to encompass all similar processes. To the contrary, it refers to a generic "the initial alignment" as made through "a rubbing process or the like," which suggests the "rubbing direction" is more likely to be specific to the rubbing process.

Notably, the written description does not use "direction of initial alignment" synonymously with "rubbing direction." Instead, both are referenced distinctly: "Referring to FIG. 9, the areas D each correspond to a range extending from a position at which the *direction of initial alignment of the liquid crystal molecule L matches the rubbing direction* R-R to a position at which the liquid crystal molecule L is rotated clockwise by 90° at the edge of the slit 61." (*Id.*, 11:1-16 (emphasis added)). As a result, the patentee has given the "rubbing direction" a distinct meaning that is tied to the rubbing process.

The parties submit extrinsic evidence from their experts, who both opine that the rubbing process is a well-known mechanical process in liquid crystal technology similar to brushing that leaves grooves in the rubbed material that cause the liquid crystal molecules to align along the grooves and, thus, sets the rubbing direction. (*Compare* Dkt. 100-5, ¶ 44 and Dkt. 100-9, ¶¶ 64-66). Dr. Schubert's opinion that "rubbing direction" has taken on a secondary meaning to be an initial alignment direction is, however, unsupported and less persuasive. Though he mentions various texts on liquid crystal technology around 2006 describing both the rubbing direction and the rubbing process, as well as listing other equivalent processes, he cites to none that show a generic use of "rubbing direction."

The Court therefore finds the opinion of BOE's expert, Dr. Souri, to be more credible here in light of the evidence as a whole. He explained that a person of ordinary skill in the art would understand that "rubbing direction" refers to the direction of a rubbing process and would not use "rubbing direction" in the context of an alignment process that does not involve rubbing. (Dkt. 100-9, ¶ 67.) Indeed, nowhere in the intrinsic evidence has Longitude shown that the term "rubbing direction" is used in the context of a generic process.

Longitude's concern that this interpretation improperly introduces an unclaimed process requirement into an apparatus claim is unfounded. Explaining that the claimed "rubbing direction" is derived from a rubbing process does not transform an apparatus claim into a method claim. Such an explanation does not claim any steps in a process, but merely the result.

The Court therefore finds the claim term "rubbing process" **means a "direction created by the rubbing process."**

**3. "wherein the second curved portion includes a projecting portion"**

| Claim term | Plaintiffs' Construction | Defendant's Construction |
|---|---|---|
| "wherein the second curved portion includes a projecting portion"<br><br>('948 Patent, claim 1) | No construction necessary | "wherein the second curved portion includes a portion not entirely defined by round edges" |

The dispute as to this term is whether a prosecution disclaimer applies to "a projecting portion" that narrows its meaning as BOE proposes.

Claim 1 of the '948 Patent reads as follows, with the term at issue in bold:

> 1. A liquid crystal display device comprising:
> a substrate;
> an upper electrode layer formed on the substrate, the upper electrode layer having slits;
> an insulating layer formed between the substrate and the upper electrode layer; and
> a lower electrode layer formed between the substrate and the insulating layer;
> the slits allowing for application of a voltage between the upper electrode layer and the lower electrode layer, the voltage driving liquid crystal molecules, an upper electrode layer and a lower electrode layer formed on a same substrate via an insulating layer,
> the insulating layer comprising slits formed on the upper electrode layer for applying voltage between the upper electrode layer and the lower electrode layer and for driving liquid crystal molecules,

> edge portions of the slits each including a first curved portion the tangential direction of which at the edge portions with respect to a rubbing direction falls within a range from 0° to +90° and a second curved portion the tangential direction of which at the edge portions with respect to the rubbing direction falls within the range from 0° to −90°, where the direction toward an acute angle subtended by the long sides of the slits with respect to the rubbing direction is the positive direction, the second curved portion being smaller than the first curved portion, **wherein the second curved portion includes a projecting portion,** the projecting portion being located at a distal end of the second curved portion.

Longitude argues "a projecting portion" should be given its plain and ordinary meaning, which its expert, Dr. Schubert, defines as a "protruding portion," a "bulged-out portion," or, equivalently, a "portion that juts out." (Dkt. 100-5, ¶ 49.) Dr. Schubert opines that these generally understood meanings in the art are consistent with non-technical dictionary definitions such as Merriam Webster's definition of "projection," which is "a jutting out," or "a part that juts out." (*Id.*). Longitude asserts that neither the '948 Patent nor the prosecution history says anything about "round edges" in the context of projecting portions, as BOE suggests.

BOE responds that its proposed construction should be adopted because the Applicant expressly disclaimed rounded edges from the projecting portion during prosecution. BOE points to the Applicant's statement in overcoming a §102 rejection by distinguishing prior art reference Kim-520 in that it "fails to disclose or suggest a liquid crystal display device having a second curved portion which includes a projecting portion located at a distal end of the second curved portion." (Dkt. 106-2 at LLL0002316 (emphasis by Applicant)). Applicant argued that the slits in Kim-520 "are defined by round edges" and are not the claimed "projecting portion," which forms the basis of BOE's position here. (*Id.*). BOE further submits the annotated FIG.3a of Kim-520, reproduced below, that illustrates the distinction.




**Annotated Fig. 3a of Kim-520 (showing rounded edges of slits).**

Upon a review of the prosecution history of the '948 Patent, the Court finds that no prosecution history disclaimer exists as BOE suggests. In making the statement above, the Applicant was simply distinguishing the claimed invention that has "a projecting portion" from a reference that lacks a projecting portion. Applicant was not pointing to a "projecting portion" in KIM-520 and expressly disclaiming the invention's projecting portion from having round edges like the prior art projecting portion. Accordingly, this statement does not rise to the level of an unmistakable disavowal of claim scope. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (requiring "words or expressions of manifest exclusion or restriction" and "clear disavowal of claim scope" for establishing that an inventor has unequivocally demonstrated intent to deviate from the ordinary meaning of a straightforward claim term).

BOE's oral argument pointing to the Examiner's identification of "protrusions" in the slightly asymmetric shape of the slits in KIM-520 is similarly unpersuasive. The Examiner's choice to use the word "protrusions" does not affect the fact that KIM-520 did not disclose "projecting portions" and was distinguished on that basis.

Moreover, the Court notes that claim 1 of the '948 Patent includes no description of round edges with respect to the projecting portion except that the projecting portion is located within a second curved portion of an edge portion of the slits. Likewise, the specification makes no mention of round edges in the context of the projecting portions. The description of "projecting portion" in the specification provides an embodiment: "[a]ddition of the projecting portion 78 shown in FIG. 12 is a case in which a rectangular or a parallelogram pattern is added to the exposure mask." ('948 Patent, 13:42-45.) An inspection of FIG. 12, reproduced below, shows that the projecting portion 78 is in a rectangular or parallelogram shape and does indeed have somewhat rounded edges.

FIG. 12




Moreover, although BOE contends that the claimed "projecting portion" requires additional features other than round edges, such is already provided for by the claim language. By virtue of requiring an additional portion that is "projecting," it is a feature that must protrude or jut out from the second curved portion.

The Court is persuaded that a person of ordinary skill in the art would understand the term "projecting portion" to have a commonly understood meaning within the context of the intrinsic and extrinsic evidence such that no construction is deemed necessary.

The Court therefore finds that the term "wherein the second curved portion includes a projecting portion" **should be given its plain and ordinary meaning.**

**4. "the projecting portion being located at a distal end of the second curved portion"**

| Claim term | Plaintiffs' Construction | Defendant's Construction |
|---|---|---|
| "the projecting portion being located at a distal end of the second curved portion"<br><br>('948 Patent, claim 1) | No construction necessary<br><br>If necessary for clarity to the factfinder with respect to certain terms, "distal" means "away from the center" | Indefinite |

This term is the clause immediately following the preceding term regarding the location of the projecting portion. The issue here is whether "a distal end of the second curved portion" is a precise enough location that can be reasonably ascertained by one of skill in the art.

The relevant claim element reads as follows:

> edge portions of the slits each including a first curved portion the tangential direction of which at the edge portions with respect to a rubbing direction falls within a range from 0° to +90° and a second curved portion the tangential direction of which at the edge portions with respect to the rubbing direction falls within the range from 0° to −90°, where the direction toward an acute angle subtended by the long sides of the slits with respect to the rubbing direction is the positive direction, the second curved portion being smaller than the first curved portion, wherein the second curved portion includes a projecting portion, **the projecting portion being located at a distal end of the second curved portion**.

Longitude submits an annotated FIG. 11 from its expert, reproduced below, that identifies

where the "distal end of the second curved portion" is located.




**FIG. 11**

Longitude explains that the slit 61 has an "edge portion" with two curved portions (the first curved portion being the longer curve, the second curved portion being the shorter curve) that each have two ends where the two ends nearest to each other along the respective curved portions are proximal ends and the two ends furthest from each other are distal ends. The claimed "projecting portion" must be located "at a distal end of the second curved portion," which is in the same location as shown in FIG. 12, *supra*; thus, Longitude contends that this term cannot be indefinite.

BOE disagrees, asserting that "a distal end of the second curved portion" is recited in isolation, without a reference point, and without identifying what it is distal from. According to BOE, a person of ordinary skill would not be able to identify where that is because no guidance exists in the specification or the claim.

Turning first to the claim language to guide its analysis, the Court notes that claim 1 provides some orienting information. In particular, claim 1 recites that the edge portions of the

slits include a first curved portion and a second curved portion where the first curved portion is above the rubbing direction (0º to +90 º) and the second curved portion is below (0 º to -90 º). Additionally, the second curved portion is smaller than the first curved portion. Moreover, claim 1 recites that the second curved portion includes a projecting portion that is located at a distal end of the second curved portion.

FIG. 11 in the specification, *supra*, shows the edge portion of a slit and the location of the first curved portion and second curved portion as set forth in the claim. As illustrated, it is apparent that the first and second curved portions are next to each other where one end of each curved portion is nearer to each other whereas the opposing end of each curved portion is farther from each other. There does not appear to be a dispute between the parties about the meaning of distal; only over the reference point from which the end is distal.

FIG. 12 (in discussion of Term #3, *supra*) then identifies the location of the projecting portion 78 located at the end of the second curved portion farther from the first curved portion. It follows logically then, that reading the claims in light of the specification would reveal the distal ends of each curved portion to be distal in reference to each other. Thus, a reasonable understanding of this term would be that the distal end of the second curved portion is the farther end of the second curved portion from the first curved portion.

This interpretation is consistent with the written description of the '948 Patent, which describes FIG. 12 as showing "a configuration in which projections 78 are further added to distal ends of the edge portions each defined by the inclined end line 72 . . . ." ('948 Patent, 13:23-25.) Although the use of "distal ends" is in reference to the "edge portions," it is already established that the curved portions are subcomponents of the edge portions. Accordingly, one of skill in the art would be able to reasonably ascertain the meaning of this term when it is read in context of the

patent drawings and written description.

The Court therefore finds the term "the projecting portion being located at a distal end of the second curved portion" is not indefinite and **means "the projecting portion being located at the end of the second curved portion farthest from the first curved portion."**

**U.S. Patent No. 8,223,093**

**5. "extending in a/the direction"**

| Claim term | Plaintiffs' Construction | Defendant's Construction |
|---|---|---|
| "extending in a/the direction"<br><br>('093 Patent, claim 1) | No construction necessary<br><br>If necessary for clarity to the factfinder with respect to certain terms, "semiconductor layer extending in a/the direction" refers to "semiconductor layer extending in a/the direction of the main current path" | "elongated in a/the direction," otherwise indefinite |

The dispute as to this term is similar to Term #1 in that the parties largely make the same arguments across the different claims and patents and submit similar proposed constructions. As in Term #1, both sides appear to agree that "extend" expresses a geometric relationship between the recited claim elements.

Longitude again contends that this term needs no construction and, in the alternative, submits a construction proposed by its expert regarding the direction of current flow in a transistor. Longitude opposes BOE's proposal of "elongated" by arguing that it would exclude the

specification's disclosure of elements $1f_1$ and $1f_2$ in the first and second semiconductor layers, which are shown in FIG. 4A to extend both north/south and east/west.

BOE responds that its position does not read out any embodiments because, despite the drawing in FIG. 4A, the elements $1f_1$ and $1f_2$ are described in the written description as "extending from the heavily doped drain region $1e_1$ in the direction away from the scanning line $3a_1$." ('093 Patent, 8:12–15.) As a key benefit of the '903 Patent is to allow the semiconductor layers to be extended to the maximum extent possible, BOE argues that a person of skill in the art would understand that the invention is intended to provide a semiconductor layer as "long" as possible, i.e., to have an "elongation" in the direction that it extends. In the alternative, BOE argues that the "extending" limitations are indefinite because the first and second semiconductor layers could extend in an arbitrary direction.

The Court begins its analysis with a review of claim 1 of the '093 Patent, which reads as follows, with the disputed terms in bold:

> 1. An electro-optical device comprising an element substrate having:
> a first signal line **extending in a** first direction;
> a second signal line **extending in a** second direction crossing the first direction;
> a first pixel electrode electrically connected to the first signal line;
> a second pixel electrode electrically connected to the first signal line and adjacent to the first pixel electrode;
> a first field-effect transistor electrically connecting the first pixel electrode to the first signal line; and a second field-effect transistor electrically connecting the second pixel electrode to the first signal line; wherein the first field-effect transistor includes a first semiconductor layer **extending in a direction** crossing the second direction,
> wherein the second field-effect transistor includes a second semiconductor layer **extending in the** direction crossing the second direction,
> wherein the first semiconductor layer and the second semiconductor layer are displaced from each other in the second direction, and
> wherein an end of the first semiconductor layer facing toward the second pixel electrode is adjacent to an end of the second semiconductor layer facing toward the first pixel electrode or is closer to the second pixel electrode than the end of the second semiconductor layer facing toward the first pixel electrode.

As in Term #1, the claim language provides the geometric relationship between the various components to describe axes crossing in a grid-like pattern. A first signal extends in a "first direction." A second signal extends in a "second direction crossing the first direction." A first field effect transistor (FET) having a first semiconductor layer extends in "a direction crossing the second direction," which could be the same first direction. And a second FET including a second semiconductor layer that extends in the same "direction crossing the second direction" as the first semiconductor layer. Again, the parties largely agree that the directions in which the two signal lines extend is understandable from the claims and specification. Thus, the main dispute is over the direction in which the semiconductor layers extend.

The claim language reads "the first field-effect transistor includes a first semiconductor layer extending in a direction" and "the second field-effect transistor includes a second semiconductor layer extending in the direction." The semiconductor layers are an integral part of the field-effect transistors (FET) and cannot be considered simply a geometric shape in the abstract. As Dr. Schubert explained, a person of ordinary skill in the art would understand the term "semiconductor layer" to refer to the channel area along with the source and drain for the FET, and the direction of extension to be the main current path between the source and drain electrodes. (Dkt. 100-5, ¶¶ 64-65.) The Court is persuaded by Dr. Schubert's explanation with the caveat that, like in Term #1, additional clarification is needed because the main current path is not always clear. The Court therefore construes this term as "a [first/second] semiconductor layer that runs between source and drain electrodes."

This construction is consistent with the specification, which describes the first semiconductor layer $1a_1$ as "extend[ing] from a position where it overlaps the first pixel electrode

$9a_1$ in plan view to a position where it overlaps the second pixel electrode $9a_2$ in plan view," which shows the extension as being from the source region to the drain region of the FET. ('093, 9:13-20 and FIG. 4A.) In addition, the specification discloses an extending portion $1f_1$ of the first semiconductor layer "extending from the heavily doped drain region $1e_1$ in the direction away from the scanning line $3a_1$." (*Id.*, 8:12-15 and FIG. 4A.) Such a disclosure describes the extending portion $1f_1$ as extending along its shorter dimension, which is inconsistent with BOE's position that an object that is "extending in a direction" must mean that it is longer than it is wide.

Accordingly, the Court is not persuaded by BOE's proposed constructions and therefore rejects them. The word "elongated" is in neither the claims nor specification. It is unclear what kind of shape is "elongated" or how a line or semiconductor layer can be "elongated" in a way that is more accurate or meaningful than the words in the claim as written. Such a construction would be more confusing than helpful to the jury.

The Court therefore finds the claim term "extending in a/the direction" **is not indefinite** and, as applied to the "signal lines," **should be given its plain and ordinary meaning**. The Court further finds that "a first/second semiconductor layer extending in a/the direction" **to mean "a first/second semiconductor layer that runs between source and drain electrodes."**

**6. "wherein an end of the first semiconductor layer facing toward the second pixel electrode is adjacent to an end of the second semiconductor layer facing toward the first pixel electrode or is closer to the second pixel electrode than the end of the second semiconductor layer facing toward the first pixel electrode"**

| Claim term | Plaintiffs' Construction | Defendant's Construction |
|---|---|---|
| "wherein an end of the first semiconductor layer facing toward the second pixel electrode is adjacent to an end of the second semiconductor layer facing toward the first pixel electrode or is closer to the second pixel electrode than the end of the second semiconductor layer facing toward the first pixel electrode"<br><br>('093 Patent, claim 1) | No construction necessary<br><br>If necessary for clarity to the factfinder, "or is closer to the second pixel electrode than the end of the second semiconductor layer facing toward the first pixel electrode" means "or is closer to the second pixel electrode than the end of the second semiconductor layer facing toward the first pixel electrode **is to the second pixel electrode"** | Indefinite |

The issue as to this term is whether one of ordinary skill in the art would find that it is subject to two reasonable interpretations and, as a result, the term is rendered indefinite to one of ordinary skill in the art.

The relevant term is the last element of claim 1 in the '093 Patent. Longitude, which contends that no construction is necessary, submits that this term is a disjunctive clause reciting two limitations separated by the word "or." The first limitation recites "wherein an end of the first semiconductor layer facing toward the second pixel electrode is adjacent to an end of the second semiconductor layer facing toward the first pixel electrode," and the second limitation recites "wherein an end of the first semiconductor layer facing toward the second pixel electrode . . . is

closer to the second pixel electrode than the end of the second semiconductor layer facing toward the first pixel electrode." Longitude states that both clauses have a readily ascertainable meaning in the context of FIG. 4A and the specification. Alternatively, Longitude proposes appending "is to the second pixel electrode" onto the end of the claim term to clarify the recited geometric relationship.

BOE does not appear to disagree with the way Longitude breaks the term down into two limitations. BOE argues, however, that the second limitation can be interpreted in at least two ways. For the first interpretation, BOE adopts Longitude's recitation above. As for the second interpretation, BOE contends that it can also mean wherein "an end of the first semiconductor layer facing toward the second pixel electrode . . . is closer to the second pixel electrode than [the end of the first semiconductor layer to] the end of the second semiconductor layer facing toward the first pixel electrode." In both interpretations, BOE further identifies the distance between "the first semiconductor layer" and the "second pixel electrode" as the depth between the two material layers, as indicated by D1 in BOE's annotated FIG. 4B, reproduced below:

FIG. 4B




To begin its analysis, the Court notes that the parties are aligned in that the disputed term is made up of two disjunctive clauses separated by an "or." The Court also notes that there appears to be no disagreement regarding the meaning of the first clause in this claim term: "wherein an end of the first semiconductor layer facing toward the second pixel electrode is adjacent to an end of the second semiconductor layer facing toward the first pixel electrode." For that reason, the focus of the Court's analysis will be on the second clause: "wherein an end of the first semiconductor layer facing toward the second pixel electrode . . . is closer to the second pixel electrode than the end of the second semiconductor layer facing toward the first pixel electrode."

With respect to this second clause, there are two main points of contention. The first and primary one is whether the relative distance between the "end of the first semiconductor layer facing toward the second pixel electrode" and the "second pixel electrode" is a measurement in

plan-view of the pixel along the X-Y axis or whether it is a measurement of depth between material layers.

Reading the claim language, it is most clearly written in consideration of a plan-view layout of the recited components. In particular, claim 1 describes signal lines extending in two directions that cross each other. The claim further discloses two pixel electrodes placed adjacent to each other. The claim then describes that the two semiconductor layers are displaced from each other in one of the two directions. Thus, the claim makes the most sense when read in the context of a two-dimensional arrangement.

The supporting written description further illustrates embodiments of the claimed layout in plan view. (*See, e.g.*, FIGS. 2A, 3, 4A showing the X-Y axis.) The claimed orientation creates certain benefits described in the patent that is derived in plan view: "This [configuration] allows the first and the second semiconductor layers $1a_1$ and $1a_2$ to be extended to the maximum extent possible. Accordingly, even if the pixel pitch P is reduced, problems such as a decrease in the source-drain breakdown voltage of the field-effect transistors 30 do not occur." ('093 Patent, 10:30-35.) Although descriptions of sectional views also appear, they are not tied to the layout of the signal lines, semiconductor layers, and pixel electrodes relative to each other in the way that is claimed. As a result, BOE's interpretation of distance as the depth of the first semiconductor layer to the second pixel electrode cannot be a reasonable reading of the claim as written and in light of the patent as a whole. The distances must refer to ranges along the X-Y axis in plan view.

The next question to be answered is whether the distance between "an end of the first semiconductor layer" and the "second pixel electrode" is made against one or two possible options. BOE submits that it can be compared to the distance between (i) the "end of the second semiconductor layer" and "the second pixel electrode layer" ***as well as*** (ii) the distance between

the "end of the second semiconductor layer" and the "end of the first semiconductor layer." But the latter option proposed by BOE is a strained reading of the claim language.

The relevant clause has a sentence structure as follows: wherein A is closer to B than C. The natural understanding of this comparison is that A is closer to B than C is to B. Instead, BOE proposes it can also be interpreted as A is closer to B than C is to A. From a grammatical perspective, that is incorrect as B is the obvious anchor of comparison, making the first possible option the more plausible reading of the claim. Indeed, BOE cites to nothing in the intrinsic evidence that supports the second option as a possible basis of comparison.

While the meaning of the claim term is reasonably ascertainable, the dispute between the parties raises enough confusion that the Court is persuaded that clarification will be helpful to the jury. Both sides appear to be in agreement that Longitude's alternative proposed construction (in the structure of A is closer to B than C is to B) is correct because one of BOE's proposed options includes the same appended clarification. (*See* Dkt. 106, p. 24.)

The Court therefore finds the term "wherein an end of the first semiconductor layer facing toward the second pixel electrode is adjacent to an end of the second semiconductor layer facing toward the first pixel electrode or is closer to the second pixel electrode than the end of the second semiconductor layer facing toward the first pixel electrode" is not indefinite and **means "wherein an end of the first semiconductor layer facing toward the second pixel electrode is adjacent to an end of the second semiconductor layer facing toward the first pixel electrode or is closer to the second pixel electrode than the end of the second semiconductor layer facing toward the first pixel electrode is to the second pixel electrode."**

**U.S. Patent No. 9,557,606**

**7. "dot conductive points"**

| Claim term | Plaintiffs' Construction | Defendant's Construction |
|---|---|---|
| "dot conductive points"<br><br>('606 Patent, claims 7, 13) | Plain and ordinary meaning.<br><br>If necessary for clarity to the factfinder, "points of contact between a conductive particle or other conductive dot and an electrode on a substrate to create electrical connection between first and second substrates" | "a conductive member in the shape of a dot, not an area" |

The dispute as to this term is whether "points" refer simply to the points of contact (electrical connection) or are physical conductive members. And if it is the latter, whether a prosecution history disclaimer applies to narrow the term to "the shape of a dot, not an area."

Both claims 7 and 13 use "dot conductive points" in similar context. So for convenience, the Court reviews claim 7, which reads as follows, with the disputed term in bold:

> 7. A display device, comprising:
> a first substrate including a pixel region and a seal region which is defined around the pixel region on a first surface of the first substrate, the pixel region including a plurality of pixels and a plurality of active elements, and the seal region forming a rectangular ring shape, wherein the active elements are thin film transistors disposed on the first substrate; and
> a second substrate including a common electrode on a second surface; and a seal member bonding the first substrate and the second substrate so that the first surface faces the second surface and the common electrode is disposed opposite to the plurality of pixels,
> wherein the first substrate includes a protruding region which protrudes over the second substrate in a plan-view of the first substrate,

> the seal region includes a first side, a second side, a third side and a fourth side, the first side is positioned between the pixel region and the protruding region, and opposed to the third side, and the second side is opposed to the fourth side,
>
> the seal member is disposed between the first substrate and the second substrate, and positioned on the first side, the second side, the third side and the fourth side continuously, forms a closed-ring shape in which the pixel region is positioned without protruding from the second substrate in the plan-view of the first substrate, and is formed continuously around the entire pixel region without the use of a plug,
>
> a first part of the seal member disposed on the third side which is opposed to the protruding region with respect to the pixel region includes a plurality of conductive particles,
>
> a plurality of **dot conductive points** are disposed on the third side of the first substrate, all of the plurality of the **dot conductive points** are electrically connected to the common electrode, and
>
> each of the plurality of the **dot conductive points** are spaced apart from each other,
>
> wherein the first substrate includes a plurality of wiring lines that connect to the plurality of active elements, and the plurality of wiring lines extend onto the protruding region across the seal member without connecting to the **dot conductive points**.

Longitude contends that "dot conductive points" must refer to points creating electrical connection (conduction) using a dot shape, and it needs no construction when read in the context of the claim as a whole. In addition, Longitude draws a distinction between the "dot conductive ***points***" as recited in the claims from the "dot conductive ***portions***" as described in the specification by arguing that the use of different wording means that they are two different elements. According to Longitude, any construction or disclaimer as to the term "dot conducive portion" should not be equally applied to "dot conductive points."

BOE disagrees, arguing that the Applicant narrowed the meaning of this term during prosecution by distinguishing the Miyazaki prior art reference as disclosing a "conductive portion . . . [that] is an area, not a dot," unlike the present invention. Moreover, BOE contends that amendments made during prosecution show that the Applicant considered "dot conductive points" to be a subset of the previously claimed "conductive portion."

Reviewing the claim language, the Court notes that claim 1 provides for "a plurality of conductive portions, the plurality of conductive portions being a plurality of dot conductive points." This wording suggests that "dot conductive points" are a subset of "conductive portions." Although claim 1 is not raised in the parties' briefing, it contains similar terms as claims 7 and 13 and provides valuable insight as to the meaning of a claim term, particularly as usage of this term is consistent across the independent claims. *Phillips*, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.") (internal citations omitted).

Each of claims 1, 3, and 7 identify that the dot conductive points are "disposed" on a portion or side of the substrate and are "electrically connected to the common electrode." A mere point of contact that creates an electrical connection, as Longitude proposed, would not have to be "disposed" on one side of the substrate. Nor would the point of electrical connection need to be described as being electrically connected because an electrical connection would be an inherent feature of the point of contact, or point of electrical connection. Indeed, Dr. Schubert explained that a person of ordinary skill would understand that "dot conductive points" refer to points of electrical connection (conduction). (Dkt. 100-5, ¶ 84).

Moreover, the descriptor of ***dot*** conductive points is sufficiently descriptive that a dot-shaped point is what facilitates the conduction of electricity. Notably, there does not appear to be a disagreement between the parties that the "conductive point" takes the shape of a dot. Therefore, the claims read as a whole demonstrate that "dot conductive points" are a subset of "conductive portions" and are physical conductive members in the shape of a dot.

The specification is consistent with this interpretation. Although the exact phrase "dot conductive points" does not appear in the written description, there is also no description of such

as mere points of contact as Longitude proposes. Rather, "dot conductive ***portion***" appears many times in the specification and is described in a similar manner as the claim language describes "dot conductive points." FIG. 28 illustrates a liquid crystal device that has on the TFT substrate 102 a conductive sealing member 52b and "dot conductive portions (first conductive portions or conductive regions) 87." ('606 Patent, 37:53-57.) Consistent with the language of claim 1, the "dot conductive portions" is also described as "conductive portions or conductive regions," and of which the "dot conductive points" is a subset. In addition, the specification goes on to describe how the "TFT substrate 102 is electrically connected to the counter substrate via the dot conductive portions 87." (*Id.*, 37:65-38:3.) Thus, "dot conductive portions" is an embodiment of the claims and cannot be read out of the claims.

Turning to the prosecution history of the '606 Patent, the Court next assesses whether a prosecution disclaimer applies. The USPTO issued a §103 rejection based on Miyazaki disclosing "a conductive portion." In its office action response, the Applicant amended the pending claims to replace "conductive portions" with "dot conductive points." The Applicant further acknowledged that Miyazaki discloses a conductive portion but argued that the disclosed conductive portions are not dot conductive points, as now claimed for the invention. Therefore, the distinction of the conductive portions being dot-shaped points (as opposed to the elongated shape of Miyazaki), is a crucial aspect of the claimed invention. This point is driven home with the Applicant distinguishing the conductive portion of Miyazaki as "an area, not a dot." (Dkt. 106-4 at LLL0002740.) Consequently, the Applicant's narrowing statements to overcome Miyazaki are a clear and unmistakable disavowal of claim scope that limits the invention to the dot-shape of the conductive points.

The Court therefore finds that the term "dot conductive points" **means "conductive members in the shape of a dot."** The Court does not find a need to include the negative limitation of "not an area" because the additional distinction, if any exists, is unclear from BOE's argument, and including it is more likely to be confusing to the jury.

## V. CONCLUSION

The Court adopts the constructions as set forth in this opinion for the disputed terms of the Patents in Suit.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 3rd day of February, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE